1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11 | JAMES D. HOLT,

12 |       Plaintiff,

13 |     v.

14 | CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

15

16 |       Defendant.

17

Case No.: 1:13-cv-01285 - JLT

ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF JAMES HOLT

18       Plaintiff James D. Holt asserts he is entitled to supplemental security income under Title XVI of

19 the Social Security Act.  Plaintiff argues the administrative law judge ("ALJ") erred in assessing the

20 credibility of his subjective complaints and in evaluating the medical evidence related to his social

21 functioning.  For the reasons set forth below, the ALJ's decision is **AFFIRMED**.

22                     **PROCEDURAL HISTORY**

23       Plaintiff filed his application for supplemental security income on March 19, 2008 and alleged

24 his disability began on January 7, 2007.  (Doc. 8-4 at 7.)  The Social Security Administration denied

25 Plaintiff's claim initially on June 5, 2008, and upon reconsideration on October 9, 2008.  (*Id.*; *see also*

26 Doc. 8-5 at 2-9.)  After requesting a hearing, Plaintiff testified before an ALJ on December 7, 2009.

27 (Doc. 8-5 at 7.)  The ALJ determined Plaintiff was not disabled under the Social Security Act, and

28 issued an order denying benefits on December 17, 2009.  (Doc. 8-4 at 7-15.)

Plaintiff requested the Appeals Council review the decision, and his request was granted on November 10, 2011.  (Doc. 8-4 at 20.)  The Council found the ALJ "did not properly assess the claimant's mental impairments."  (*Id.* at 20.)  The Council observed, "The hearing decision found the claimant to have severe impairments of attention deficit disorder and bipolar disorder, but then states only that the record does not show probative difficulties in daily living, social functioning, concentration or episodes of decompensation."  (*Id.*)  As a result, the ALJ failed to "evaluate all of the claimant's mental impairments in accordance with the special technique defined within the regulation (20 CFR 416.920a)."  (*Id.*)   Further, the Appeals Council observed:

> The consultative evaluation in Exhibit 8F found the claimant to have opioid dependence, amphetamine dependence, attention deficit hyperactivity disorder and rule out cognitive disorder not otherwise specified.  It found limitations in social functioning and concentration.  Internally, the decision on page 6 of 9 gave the global assessment score of forty-five found by the consultative evaluation no weight, but then gave significant weight to this opinion.  A state agency reviewer in Exhibit 7F and affirmed in Exhibit 10F found the claimant to have moderate limitations in social functioning and concentration with one or two episodes of decompensation.  In Exhibit 6F, the state agency reviewer found the claimant's concentration variable.  He can have superficial public and co-worker contact.  He would benefit from supportive supervision and vocational counseling.  He may adapt slowly to changes.

(Doc. 8-4 at 20.)  Therefore, the Appeals Council found that the record "indicate[d] limitations in social functioning that [were] not reflected in the residual functional capacity."  (*Id.*)

The Appeals Council remanded the decision to the ALJ, instructing him to "[f]urther evaluate the claimant's mental impairments …, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 416.920a(c)."  (Doc. 8-4 at 21.)  Also, the ALJ was directed to "[g]ive further consideration to the claimant's maximum functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations."  (*Id.*, citing 20 CFR 461.945 and Social Security Rulings 85-16 and 96-8p.)  Finally, the Appeals Council noted that while Plaintiff's request for review was pending, Plaintiff filed a second claim for supplemental security benefits.  (*Id.*)  Accordingly, the ALJ was directed to "associate the claim files and issue a new decision on the associated claims."  (*Id.*)

Plaintiff testified at a second hearing on March 20, 2012.  (Doc. 8-3 at 19, 42.)  The ALJ found Plaintiff was able to perform the full range of physical exertion levels, but was mentally limited to

2

unskilled work.  (*Id.* at 27.)  As a result, the ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying his applications for benefits on April 19, 2012.  (*Id.* at 19-35.)  The Appeals Council denied review of the second decision on June 19, 2013.  (*Id.* at 2-4.)  Thus, the ALJ's were adopted the Commissioner of Social Security ("Commissioner"), and became the final decision in the action.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

3

1    *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  Once a claimant establishes a prima facie case of

2    disability, the burden shifts to the Commissioner to show the claimant is able to engage in substantial

3    gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

### ADMINISTRATIVE DETERMINATION

4

5          To achieve uniform decisions, the Commissioner established a sequential five-step process for

6    evaluating a claimant's alleged disability.  20 C.F.R. § 416.920(a)-(f).  The process requires the ALJ to

7    determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged

8    disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed

9    impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the

10   residual functional capacity to perform to past relevant work or (5) the ability to perform other work

11   existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider objective

12   medical evidence and hearing testimony.  20 C.F.R. § 416.927.

13   **A.      Relevant Medical Evidence**[1]

14         On December 27, 2007, Plaintiff underwent an initial assessment at Central Washington

15   Comprehensive Health Center with Tracy Molina, MSW.  (Doc. 8-9 at 4-9.)  Plaintiff reported he was

16   currently on probation, which "was recently violated for failure to report and a positive UA."  (*Id.* at 4.)

17   He told Molina that he was "seeking services as a mandate from his probation officer."  (*Id.* at 7-8.)

18   Plaintiff reported "he was diagnosed ADHD as a child, but was "not ADHD anymore."  (*Id.* at 4.)  In

19   addition, Plaintiff reported he was "diagnosed with bipolar disorder" and had been hospitalized once in

20   the last year.  (*Id.* at 8.)  He "complain[ed] of extreme difficulty quitting heroin" and admitted "to being

21   chemically dependent." (*Id.* at 4, 8.) Plaintiff expressed an interest in a methadone program, and Molina

22   recommended "a psychiatric evaluation for medication management." (*Id.* at 8.)  Molina believed

23   Plaintiff had an antisocial personality disorder, had "an inflated self esteem and grandiosity," appeared

24   "highly distractible," and exhibited "[p]roblems related to interacting with [the] legal system." (*Id.* at

25   4, 7.)  On the other hand, Plaintiff acted in a cooperative manner and "seem[ed] to be helpful toward

26

27         _____

           [1] Plaintiff disputes the ALJ's evaluation of medical opinions related to his mental impairments and does not
28   challenge the ALJ's findings related to his physical abilities. Therefore, the Court summarizes only the medical evidence
     related to Plaintiff's mental limitations and abilities.

1   others." (*Id.* at 4-5.) Molina believed Plaintiff exhibited "[l]ess severe mental disorder and more severe

2   substance disorder." (*Id.* at 8.) Molina gave Plaintiff a current GAF score of 40.[2] (*Id.* at 7.)

3          On April 1, 2008, Plaintiff was admitted to an American Behavior Health Services facility for a

4   28-day treatment. (Doc. 8-9 at 11.) Plaintiff was diagnosed with chemical dependency, including

5   alcohol, opioids, and cannabis. (*Id.*) He reported that he last consumed alcohol on the day he was

6   admitted, and last used heroin on February 25, 2008. (*Id.* at 12.) While at the facility, Plaintiff

7   "experienced no issues of acute withdrawal or intoxication." (*Id.*) Plaintiff's counselor and clinical

8   supervisor noted that Plaintiff "made good progress" with dealing with his "mental health issues," and

9   "appeared [to be] coping fairly well with his ADHD and impulse control." (*Id.* at 13.) Further, the

10   counselor and clinical supervisor believed Plaintiff "made good progress in all treatment areas." (*Id.* at

11   14.) Plaintiff was discharged from the facility on April 29, 2008. (*Id.* at 11.)

12          Dr. Philip Johnson completed a consultative psychological evaluation on May 19, 2008. (Doc.

13   8-9 at 43.) Plaintiff told Dr. Johnson that he had "ADHD and bipolar disorder," and "his main problem

14   is that 'everybody thinks [he's] moving way too fast and they think [he's] on drugs.'" (*Id.* at 43.) Dr.

15   Johnson noted:

16           James reported using "weed and acid" as a kid (he first used marijuana at age 17). He
       reported that from '81 til recently he had a "non-stop problem with drugs." He used

17           cocaine in the '80's, heroin in the '90's and early '00's. He used meth from '96 til '07 or
       '08. Opiates he's used included heroin, oxycontin, and fentanyl. His last use of cocaine

18           was in the '90's. His last use of marijuana was in December '07. His last use of meth
       and heroin was in March '08. He admitted to "doctor shopping." . . .

19
               He admitted that chemical dependency has been a life-long battle for him. His longest
20           stretch of sobriety (outside of prison) has been 30 days. He indicated a continuous
       craving for opiates currently. He says meth gets him animated. Asked what he sees the

21           future being for him in the substance abuse area, he said he didn't know.

22   (*Id.* at 44.) In addition, Plaintiff told Dr. Johnson that he was able to take care of own grooming, cook

23   simple foods, do his own laundry, and "get[]around by taking a bus." (*Id.* at 47.) Plaintiff said he

24   shopped "at small stores because he doesn't like large stores," and he was "'pretty distrusting' of the

25

26       [2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and
       occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association,

27   *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 31-40 indicates
       "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major
       impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man

28   avoids friends, neglects family, and is unable to work . . .)." *DSM-IV* at 34.

general public." (*Id.*)  Plaintiff explained that "[h]is only friends are drug addicts or drunks . . . so he is kind of a hermit. (*Id.*)  Further, Plaintiff reported he had difficulty "keeping jobs because of 'lack of enthusiasm or motivation.'" (*Id.* at 49.)

Upon mental status examination, Dr. Johnson observed Plaintiff was cooperative and "oriented to person, place and time." (Doc. 8-9 at 46.)  Dr. Johnson found Plaintiff's memory was adequate; "he was able to recall 2/3 objects after an interval of 5 minutes (3/3 with cuing)" and "was able to recall 7 digits forward and 4 digits backward." (*Id.*)  In addition, Plaintiff was "able to do a 3-step command, and he was mostly able to follow the conversation." (*Id.* at 47.)  Dr. Johnson administered the Wechsler Adult Intelligence Scale- 3rd Edition (WAIS-III), and found "a lot of variability between subtests, reflecting cognitive inefficiency and unevenness of performance." (*Id.* at 48.)  Based upon the testing, Dr. Johnson opined:

> James' ability to understand and reason falls in the low average range overall.  His ability to remember is adequate.  There are some limitations in the area of social interaction, but whatever skills he has are probably adequate for a lot of jobs.  Ability to sustain concentration, persistence, and pace is variable in the short term, and in the long term he has not sustained a job past three or four months due to "lack of enthusiasm or motivation."  In the area of stress coping, he said his biggest downfall is that "it's easier to get high than to cope with stress."

(*Id.* at 49.)  According to Dr. Johnson, Plaintiff met the "criteria for antisocial personality disorder as well as ADHD." (*Id.* at 48.)  He believed Plaintiff's prognosis was poor and explained, "The pattern of antisocial behavior is unlikely to change, and a drug relapse seems quite likely outside of a structured, controlled environment." (*Id.* at 49.)  He gave Plaintiff a current GAF score of 45.[3]  (*Id.*)

Dr. James Bailey completed a psychiatric review technique and mental residual functional capacity assessment on June 5, 2008. (Doc. 8-9 at 25-42.)  Dr. Bailey opined Plaintiff was "not significantly limited" with his ability to understand, remember, and carry out both simple and complex instructions. (*Id.* at 25.)  He believed Plaintiff was "moderately limited" with his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or pears without distracting them or exhibiting behavioral

---

[3] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

6

extremes. (*Id.*)  On the other hand, Plaintiff was "not significantly limited" with the ability to maintain socially appropriate behavior. (*Id.*)  According to Dr. Bailey, Plaintiff's ability to sustain concentration, persistence and pace was "variable," and his "job retention appears to be impacted by lack of enthusiasm or motivation." (*Id.* at 41.)  Dr. Bailey opined Plaintiff had "the ability to perform simple and complex tasks," and could "have superficial public and co-worker contact." (*Id.* at 27.)  This assessment was affirmed by Dr. Sharon Underwood on October 7, 2008.  (*Id.* at 50.)

On December 8, 2008, Russell Anderson, MSW, performed an evaluation at the Washington State Department of Social & Health Services.  (Doc. 8-9 at 57-62.)  Plaintiff reported he had been sober for six months, and had a history of "ADHD, memory problems, insomnia, mood swings, fatigue, audio hallucinations, anger problems, guilt, [and] manic episodes." (*Id.* at 59-60.)  Anderson observed that Plaintiff's speech was "pressured" and his eye contact was "limited." (*Id.* at 61.)  Plaintiff said he was "really nervous" and he did "not like being around people much." (*Id.*)

On October 13, 2009, Dr. Jagdeep Garewal examined Plaintiff at Ridgecrest Regional Hospital. (Doc. 8-9 at 55.)  Plaintiff reported he had been diagnosed as with a bipolar disorder and ADHD, and he had not taken medication for two months.  (*Id.*)  Also, Plaintiff reported feeling a loss of energy, anger, and a loss of concentration associated with depression.  (*Id.*)  Plaintiff stated that his "sociability ha[d] decreased" and he had "[f]eelings of worthlessness." (*Id.*)  Dr. Garewal observed that Plaintiff's thought content was depressed, and Plaintiff was "inattentive and not focused." (*Id.* at 56.)  Dr. Garewal believed "[a] short attention span [was] evident." (*Id.*)  He counseled Plaintiff "regarding the need for compliance with all medical instructions, particularly having to do with medication." (*Id.* at 66.) Dr. Garewal gave Plaintiff a current GAF score of 50.  (*Id.* at 56, 65.)

Dr. Parsons began treating Plaintiff for pain in his hip and back at the Ridgecrest Community Health Center on October 24, 2009.  (Doc. 8-9 at 70.)  Plaintiff reported he had "tried a variety of medications for ADD, ADHD, and Bipolar Disorder," and was currently taking trazadone as prescribed by Dr. Garewal.  (*Id.*)  Plaintiff said he did not have any disability that affected his learning.  (*Id.*)

Dr. H. Skopec completed a psychiatric review technique and mental residual functional capacity assessment on March 17, 2010.  (Doc. 8-9 at 73-86.)  Dr. Skopec opined Plaintiff had "moderate" limitations with his activities of daily living; maintaining social functioning; and

maintaining concentration, persistence, or pace. (*Id.* at 81.) Dr. Skopec believed Plaintiff was "not significantly limited" with his ability to understand, remember, and carry out simple instructions, but was "moderately limited" with his ability to carry out detailed instructions. (*Id.* at 84.) Also, Dr. Skopec determined Plaintiff was "moderately limited" with the ability to work in coordination or proximity to others without being distracted by them and being able to interact appropriately with the general public. (*Id.* at 84-85.) However, Plaintiff was "not significantly limited" with the ability to maintain socially appropriate behavior. (*Id.* at 85.) Dr. Skopec concluded Plaintiff "can sustain simple repetitive tasks with adequate pace and persistence, can adapt and relate to co-workers and supervisors but likely cannot work with the public." (*Id.* at 86.)

On June 8, 2010, Plaintiff had a telemedicine consultation with Dr. Garewal, who noted that Plaintiff described a "level of activity to be moderate in extent." (Doc. 8-9 at 92-93.) Dr. Garewal believed Plaintiff's behavior was "stable and uneventful" and "[his] medication compliance is good." (*Id.* at 93.) Plaintiff "complain[ed] of subjective concentration problems and difficulty focussing" [sic]." (*Id.*) Dr. Garewal observed that Plaintiff was "inattentive and . . . not focused," and his memory interfered with functioning." (*Id.*) Plaintiff exhibited "signs of anxiety" and "fair" social judgment. (*Id.*) Dr. Garewal gave Plaintiff a GAF score of 50. (*Id.* at 94.)

In addition, Dr. Garewal completed a psychiatric/psychological impairment questionnaire on June 8, 2010. (Doc. 8-9 at 108-116.) Dr. Garewal noted he had treated Plaintiff on two occasions, and diagnosed Plaintiff with a moderate Bipolar disorder, and "ADHD, combined type." (*Id.* at 108.) Further, he noted Plaintiff had agitation and labile mood, both of which were "moderate." (*Id.* at 110.) According to Dr. Garewal, Plaintiff was "moderately limited" with his ability to remember locations and work-like procedures and the ability to carry out one or two-step instructions. (*Id.* at 110-11.) He opined Plaintiff was "markedly limited" with his ability to understand and remember one or two step directions, carry out detailed instructions, maintain attention and concentration, and perform activities within a regular schedule. (*Id.* at 111.) Dr. Garewal indicated Plaintiff's ability to interact appropriately with the general public was "mildly limited," while his ability to maintain socially appropriate behavior was "moderately limited." (*Id.* at 112.) He believed Plaintiff's impairments were expected to last at least twelve months. (*Id.* at 114.) Dr. Garewal concluded that Plaintiff was "totally

disabled without consideration of any past or present drug and/or alcohol use." (*Id.* at 116.)

On July 25, 2010, Plaintiff was treated at an emergency room for a wrist injury. (Doc. 8-10 at 6.) Dr. Ama Lacy noted that Plaintiff admitted to drinking "1 to 2 beers about every morning." (*Id.*)

Dr. Parsons completed a "multiple impairment questionnaire" on August 9, 2010. (Doc. 8-10 at 16-23.) He noted that he had treated Plaintiff on a monthly basis from October 2009 to August 2010, and diagnosed Plaintiff with "severe pain in hips, lumbar spine, groin, left hand, [and] right elbow," as well as "mental disabilities." (*Id.* at 16-17.) According to Dr. Parsons, Plaintiff "can't keep a job, [had] poor basic completion, poor memory, [and] angry outbursts." (*Id.* at 17.)

On August 24, 2010, Plaintiff had a checkup with Dr. Garewal. (Doc. 8-10 at 37.) Plaintiff reported having mood swings, racing thoughts, irritability, and restlessness. (*Id.*) Dr. Garewal noted Plaintiff's psychomotor activity was "consistent with = being high," and he exhibited an "impaired" attention with a "presence of flight of ideas." (*Id.*) Dr. Garewal noted the treatment outcome was "not good," but believed Plaintiff's prognosis was "fair." (*Id.*, emphasis omitted.)

On October 20, 2010, Dr. Garewal completed a check- box form, on which he indicated Plaintiff was "totally disabled without consideration of any past or present drug and/or alcohol use." (Doc. 8-10 at 48.)

Dr. Paul Martin performed a comprehensive psychiatric evaluation on October 30, 2010. (Doc. 8-10 at 49- 53.) Plaintiff reported he had "difficulty sustaining his attention," and "trouble maintaining employment due to his poor interpersonal skills, anger and poor frustration tolerance." (*Id.* at 50.) Plaintiff "denie[d] a history of substance abuse, other than developing an addiction to pain medication." (*Id.* at 51.) He told Dr. Martin that he was "able to prepare simple meals," "do light household chores," and "utilize public transportation." (*Id.*) Plaintiff said he spent "the day at home resting, watching television, and doing errands as needed." (*Id.*) Dr. Martin observed that Plaintiff "presented in a somewhat edgy and intense manner" and "made good eye contact." (*Id.*) Upon mental status examination, Plaintiff "recalled 3 out of 3 words after a brief delay," and Plaintiff's "[m]emory for recently learned information was intact." (*Id.*) Dr. Martin found Plaintiff's "[a]ttention and concentration was fair," and "[t]here were no obvious signs of a thought disorder." (*Id.*) According to Dr. Martin, Plaintiff's "performance on [the] mental status exam [was] essentially within normal

limits." (*Id.* at 52.)  Dr. Martin opined:

> The claimant had no difficulty understanding, remembering, and carrying out simple instructions.  Claimant had mild difficulty with detailed and complex instructions.  Claimant had moderate difficulty maintaining attention and concentration for the duration of the evaluation.  Claimant's pace was mildly decreased.  Claimant demonstrated moderate difficulty with pace and persistence.  The claimant had moderate difficulty enduring the stress of the interview.  Claimant is likely to have moderate difficulty adapting to changes in routine work-related settings.  Based upon observations of current behavior and reported psychiatric history, [with] the claimant's ability to interact with the public, supervisors, and coworkers there appears to be moderate impairment.

(*Id.* at 52-53.)  Dr. Martin believed Plaintiff's prognosis was fair "[a]lthough no significant changes in his condition [were] likely to occur within the next 12 months," and he gave Plaintiff a GAF score of 60.[4]  (*Id.* at 52.)

Dr. Kristof Siciarz performed a consultative examination on December 11, 2010.  (Doc. 8-10 at 54-58.)  He determined Plaintiff's affect was normal and his responses were appropriate.  (*Id.* at 55.)  Further, Dr. Siciarz believed Plaintiff's "[m]emory [was] grossly normal."  (*Id.*)

Dr. Brooks completed a psychiatric review technique and mental residual functional capacity assessment on December 30, 2010.  (Doc. 8-10 at 59-72.)  Dr. Brooks opined Plaintiff had "moderate" limitations with his activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace.  (*Id.* at 67.)  Dr. Brooks believed Plaintiff was "not significantly limited" in the ability to understand, remember, and carry out simple instructions, but was "moderately limited" in the ability to carry out detailed instructions. (*Id.* at 70.)  Also, Dr. Brooks indicated Plaintiff was "moderately limited" in the ability to work in coordination or proximity to others without being distracted and being able to interact appropriately with the general public. (*Id.* at 70-71.)  On the other hand, Plaintiff was "not significantly limited" in the ability to maintain socially appropriate behavior. (*Id.* at 71.)  Dr. Brooks concluded Plaintiff retained "the ability to understand, remember and carry out simple work-related tasks in a work-setting with reduced interpersonal contact."  (*Id.* at 72, emphasis omitted.)  According to Dr. Brooks, there were "no significant work-related limitations in the ability to sustain concentration/persistence/pace or otherwise adapt to the requirements of a normal-work

---

[4] A GAF score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflict with peers or co-workers."  *DSM-IV* at 34.

1    setting." (*Id.*, emphasis omitted.)

2         Plaintiff began treatment with Dr. Lawrence Cosner on December 21, 2010. (Doc. 8-11 at 13.)

3    Plaintiff reported he was taking Xanax, which was working "moderately well." (*Id.*) Plaintiff said he

4    did not "not use alcohol or recreational drugs (with the exception of very rare pot use)." (*Id.*) Dr.

5    Cosner believed Plaintiff "ha[d] the look of somebody who has anxiety disorder and perhaps an

6    undifferentiated form of some sort of hyperactivity type disorder." (*Id.* at 14, 17.)

7         In a letter dated February 15, 2011, Dr. Cosner opined Plaintiff was "clearly not able to spend

8    any time in a work environment due to both the anxiety component of his various disorders as well as

9    the disordered thinking from his hyperactivity/attention deficient disorder (with certainly possibly a

10   component from other psychiatric issues a[s] well)." (Doc. 8-10 at 82.) He noted that he had seen

11   Plaintiff "several times," and his "disability status" was "quite clear." (*Id.*)

12        On August 20, 2011, Dr. Cosner indicated in a letter to Plaintiff's attorneys that he was "not

13   capable of filling out a detailed disability form like [the one provided] because it requires orthopedic

14   neurologic and physical therapy (functional) evaluations." (Doc. 8-11 at 29.) Nevertheless, Dr. Cosner

15   opined Plaintiff was "completely disabled by a combination of his underlying psychiatric disease and

16   his pain syndrome." (*Id.*) Similarly, in a letter dated August 25, 2011, Dr. Cosner opined Plaintiff's

17   disability status . . . [was] quite clear.[5] (*Id.* at 31.)

18   **B.    Administrative Hearings**

19        1.    December 7, 2009

20        Plaintiff testified that he had worked several short-term jobs, with the longest being a

21   telemarketing position that he held for "three, four months" in 2003. (Doc. 8-3 at 61.) Plaintiff said he

22   was let go because of his memory and his "inability to perform the job they wanted." (*Id.* at 61-62.)

23   Plaintiff explained that he was not "able to concentrate long enough to get all the paperwork and stuff

24   to that nature done." (*Id.* at 61.) In addition, Plaintiff said he was unable to work because he had

25   "chronic pain" in his foot, back, hip, and pelvis. (*Id.* at 63.) He believed he was able to stand for 20

26   minutes before he would start hurting, and sit for "probably half an hour." (*Id.*)

27   _____

28   [5] Notably, the letter dated August 25, 2011 is nearly identical to the letter dated February 15, 2011. (*Compare* Doc. 8-10 at 82 *with* Doc. 8-11 at 31.)

11

Plaintiff reported he did not have problems with alcohol, but only with pain medications after he was in an automobile accident.  (Doc. 8-3 at 63.)  Further, Plaintiff said he did not have problems with meth, heroin, or cocaine.  (*Id.* at 63-64.)  When the ALJ informed Plaintiff that the record indicated he spent "17 years in prison for, among other things, drugs. Used meth, heroin, cocaine, etcetera," Plaintiff stated it was "incorrect."  (*Id.* at 64.)  When questioned about his stay at the American Behavioral Health Services' sober living home, Plaintiff said he went there because he "was using pain medication," and maintained he was not drinking.  (*Id.* at 65.)

2.      March 20, 2012

Plaintiff reported that he had "several different things" wrong, including "chronic pain" and "a bunch of head injuries that causes [him] to have memory lost, inability to concentrate, and remember." (Doc. 8-3 at 45-46.)  In addition, Plaintiff said he was "ADD, ADHD[,] as well as bipolar."  (*Id.* at 46.) He testified that he slept "a lot," and would "get angry and frustrated real fast about certain things, and then two minutes later . . . be nice and calm."  (*Id.*)

Plaintiff said he was able to do household chores, and he helped his mom wash the dishes and bring in the garbage.  (Doc. 8-3 at 48.)  He said he had to be reminded to do things and, as an example, said his mother asked him "five days in a row to pick up the garbage from outside."  (*Id.*)  He testified that he did not "go [out] in public" because he "got bad anxiety."  (*Id.* at 49.)  Plaintiff reported he spent most of his days "lay[ing] around, with a remote in [his] hand" and watching documentaries on television because they were "easy to follow."  (*Id.* at 51-52.)

He said he last "worked for like two weeks" as a telemarketer, and he was fired because he was unable "to concentrate and to perform the job to their expectations."  (Doc. 8-3 at 49-50.)  He explained that the job required him to "look on the computer, contact business, see if they had debts, and consult with the people who were in the accounting, and see if they were . . . allowed to write a check for [his] company to do a consultation and do services."  (*Id.* at 50.)  Plaintiff said he had a script to follow, but he was not "a very good communicator" so he did not meet the quota.  (*Id.*)

Plaintiff testified that he had a history of using illegal drugs, and admitted that he had tried crystal meth "once or twice in [his] past, but not in like [making] a career of it."  (Doc. 8-3 at 53.) Plaintiff said his "main problem" was pain medication.  (*Id.* at 53-54.)

1    **C.     The ALJ's Findings**

2         Pursuant to the five-step process, the ALJ determined first that Plaintiff did not engage in

3    substantial gainful activity after the application date of March 19, 2008.  (Doc. 8-3 at 21.)  Second, the

4    ALJ found Plaintiff's severe impairments included "bipolar disorder and attention deficit hyperactivity

5    disorder."  (*Id.*)  The ALJ found Plaintiff had no restriction in his activities of daily living; "mild

6    difficulties" with social functioning; and "moderate difficulties" with concentration, persistence or

7    pace.  (*Id.* at 25-26.)  As a result, the ALJ found Plaintiff's mental impairments did not meet or

8    medically equal a Listing.  (*Id.*)

9         The ALJ found Plaintiff had the residual functional capacity ("RFC") "to perform a full range

10   of work at all exertional levels," but was limited to "unskilled work." (Doc. 8-3 at 26.) With this RFC,

11   the ALJ applied the Medical-Vocational Guidelines and determined there were "jobs that exist in

12   significant numbers in the national economy that the claimant can perform."  (*Id.* at 34.)  Therefore, the

13   ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 35.)

14                          **DISCUSSION AND ANALYSIS**

15        According to Plaintiff, the ALJ erred in assessing the credibility of his subjective complaints

16   and in evaluating the medical opinions offered related to his mental impairments.  (Doc. 13 at 17-33.)

17   On the other hand, Defendant asserts that the ALJ's decision should be affirmed because "the ALJ's

18   findings are supported by substantial evidence and free from reversible legal error."  (Doc. 14 at 22.)

19   **A.     Evaluation of Plaintiff's Credibility**

20        Plaintiff argues that "the ALJ's finding that [his] subjective testimony lacks credibility is not

21   supported by clear and convincing evidence."  (Doc. 13 at 29, emphasis omitted.)  When evaluating

22   credibility, an ALJ must determine first whether objective medical evidence shows an underlying

23   impairment "which could reasonably be expected to produce the pain or other symptoms alleged."

24   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d

25   341, 344 (9th Cir. 1991)).  Second, when there is no evidence of malingering, the ALJ must make

26   specific findings as to the claimant's credibility by setting forth clear and convincing reasons for

27   rejecting her subjective complaints.  *Id.* at 1036.

28        An adverse credibility determination must be based on clear and convincing evidence where

13

there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 8-3 at 28.) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible ..." (*Id.*) Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.

Plaintiff asserts that the ALJ erred in assessing the credibility of his subjective complaints because the ALJ believed Plaintiff "should have received more care than he did, should have received more aggressive treatment, should have sought care from specialist, and similar criticisms." (Doc. 13 at 30.) Further, Plaintiff argues the ALJ did not properly consider his daily activities as part of the credibility determination. (*Id.* at 32.)

On the other hand, Defendant contends that the ALJ's credibility determination was proper because "the ALJ provided a valid basis for not fully crediting Plaintiff's allegations, and his reasons are supported by substantial evidence." (Doc. 14 at 18.) Defendant argues that the ALJ considered several credibility factors, including "inconsistent statements with respect to . . . drug and alcohol use," Plaintiff's work history, the treatment received and his compliance thereto, and Plaintiff's daily activities. (*Id.* at 18-22.) Each of these factors may support an adverse credibility determination. *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

### 1.    Inconsistent statements

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). In this case, the ALJ found Plaintiff "provided conflicting information regarding his use of drugs and alcohol." (Doc. 8-3 at 25.) As noted by the ALJ, Plaintiff testified at the first hearing that he had not used illicit drugs such as "crystal methamphetamine, heroin, or cocaine," but at the second hearing admitted to

using crystal methamphetamine.  (*Id.* at 28.)  Further, as noted by the ALJ at the hearing, Plaintiff told

Dr. Johnson that he had used cocaine, heroin, methamphetamine, and marijuana—all of which Plaintiff

denied.  (*Id.* at 63-64.)  Thus, the ALJ identified inconsistencies in Plaintiff's testimony and actions,

which support the adverse credibility determination.[6]

### 2.    Plaintiff's daily activities

When a claimant spends the day "engaged in activities that are transferable to a work setting, a

finding of this fact may be sufficient to discredit a claimant's allegations of a disabling impairment."

*Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at

603).  For example, a claimant's ability to cook, clean, do laundry and manage finances may be

sufficient to support an adverse finding of credibility.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169,

1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's

activities "suggest she is quite functional.  She is able to care for her own personal needs, cook, clean

and shop.  She interacts with her nephew and boyfriend.  She is able to manage her own finances...").

Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant

exercises, gardens, and participates in community activities.  *Valentine v. Comm'r of Soc. Sec. Admin.*,

574 F.3d 685, 693 (9th Cir. 2009).

Here, the ALJ considered daily activities as reported by in the function report and at the

administrative hearings. The ALJ noted, "The record reveals that the claimant takes care of his own

grooming and hygiene needs without assistance; can cook simple foods; does dishes; can vacuum or

sweep[;] can use the telephone and telephone book to look up numbers; pays bills; has a driver's

license; gets around by taking a bus or riding his mountain bike; watches television; and reads books or

magazines."  (Doc. 8-3 at 34, citing Doc. 8-9 at 47.)  Further, the ALJ noted that Plaintiff was "able to

go out in public such as the grocery store and take public transportation such as the bus."  (*Id.*, citing

Doc. 8-9 at 47; *see also* Doc. 8-10 at 51.)  The ALJ found these activities showed Plaintiff was able "to

function satisfactorily," and disputed his allegation of a disabling antisocial disorder.  (*Id.* at 25-26, 35.)

---

[6] Notably, as the Commissioner observes, Plaintiff made several other inconsistent statements regarding "when he last worked (1997 or 2002), how long he worked in this position (a few weeks or a few months), whether he had been psychiatrically hospitalized, whether he was in special education classes, and whether he had ever been fired from a job." (Doc. 14 at 19, citing AR 48-49, 60-61, 427, 431, 468-69, 487, 595-96).

The ALJ concluded Plaintiff's activities were "not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.* at 24.)  As the Ninth Circuit explained, "Although the evidence of [the plaintiff's] daily activities may also admit of an interpretation more favorable to [him], the ALJ's interpretation was rational, and [the Court] 'must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch*, 400 F.3d at 680 (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Therefore, Plaintiff's daily activities support the adverse credibility determination.

　　　3.　　Treatment received

In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c).  Further, the Ninth Circuit has determined that an "ALJ is permitted to consider lack of treatment in his credibility determination." *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005) (finding the ALJ's consideration of the claimant's failure to seek treatment for a three or four month period was "powerful evidence"); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).

Here, the ALJ found Plaintiff had "no longitudinal history of treatment for the alleged impairments." (Doc. 8-3 at 27.)  Rather, the ALJ found "the record reflects significant gaps in the claimant's history of treatment and infrequent trips to the doctor," and "no psychiatric hospitalizations." (*Id.*)  Further, the ALJ observed that Plaintiff "relatively infrequent trips to the doctor for the allegedly disabling symptoms," and that when Plaintiff did receive treatment, it was "essentially routine and/or conservative in nature." (*Id.* at 24.)

Plaintiff argues he was financially unable to "to obtain more frequently, more aggressive, and more specialized care." (Doc. 13 at 30.)  According to Plaintiff, the ALJ erroneously stated he had "access to public health treatment, including physical and mental treatment," because Plaintiff was "unable to obtain either Medi-Cal or KMC MIA coverage." (*Id.* at 31.)  Significantly, however, Plaintiff does not address the time before his move to California and attempt to be enrolled with the Kern Medical Center Medically Indigent Adult program, or refute the determination that he received

16

1  conservative treatment.  As the ALJ noted, there are few records related to mental health treatment.

2  Because Plaintiff received only limited treatment for the alleged severe impairments, the treatment

3  sought—or lack thereof—supports the adverse credibility determination.  *See Burch v,* 400 F.3d at 681;

4  *Meanel*, 172 F.3d at 1114.

5        4.     Plaintiff's work history

6        The ALJ observed Plaintiff "worked only sporadically prior to the alleged disability onset date."

7  (Doc. 8-3 at 25.)  The ALJ opined Plaintiff's work history "raise[d] a question as to whether the

8  claimant's continuing unemployment is due to medical impairments."  (*Id.*)  Further, the ALJ noted

9  that—despite Plaintiff's hearing testimony to the contrary—Plaintiff had reported to Dr. Johnson that

10  he was "never fired from a job, but he has had a problem keeping jobs because of 'lack of motivation or

11  enthusiasm.'"  (*Id.* at 28, quoting Doc. 8-9 at 47.)

12        Plaintiff argues the ALJ's consideration of his work history was improper because he was

13  incarcerated for 17 cumulative years, which "would leave six remaining years of potential employment

14  between 1983 and 2009."  (Doc. 16 at 8.)  Plaintiff contends that he worked "qualifying work quarters

15  in five years within the aforementioned range and had minor recorded earning in two other years."  (*Id.*)

16        Significantly, the Ninth Circuit determined that a claimant's poor work history is a relevant

17  factor in a credibility determination. *Thomas*, 278 F.3d at 959; *see also Bruton v. Massanari*, 268 F.3d

18  824, 828 (9th Cir. 2001) (as part of the credibility assessment, the ALJ considered the claimant's work

19  history and his admission that he left his job for reasons other than his alleged impairment); *Drouin v.*

20  *Sullivan*, 966 F.2d 1255, 1259 (9th Cir. 1992) (finding the ALJ did not err in considering that,

21  "according to [the claimant's] own testimony, she did not lose her past two jobs because of pain").

22  Because Plaintiff only worked sporadically during the time he was not incarcerated, and Plaintiff

23  admitted that he did not lose his job due to his alleged mental impairments, his work history supports

24  the adverse credibility determination.  *See Bruton*, 268 F.3d at 828; *Drouin*, 966 at 1259.

25        5.     Criminal history

26        As noted by the ALJ, Plaintiff "was in prison for about 17 years" for drug-related crimes,

27  forgery, and burglary.  (Doc. 8-3 at 28; Doc. 8-9 at 41, 46).  An ALJ may rely upon a claimant's

28  convictions for crimes of moral turpitude as part of a credibility determination. *Albidrez v. Astrue*, 504

17

F.Supp.2d 814, 822 (C.D. Cal 2007) ("convictions involving moral turpitude . . . are a proper basis for an adverse credibility determination"); *see also Hardisty v. Astrue*, 592 F.3d 1072, 1080 (9th Cir. 2010) (in ruling on an Equal Access to Justice Act request, the Court held the ALJ's credibility determination was substantially justified when it was based, among other factors, on the claimant's prior criminal convictions). Here, Plaintiff had been incarcerated for burglary, which "is a crime involving moral turpitude because it satisfies the threshold of a crime indicating a readiness to do evil." *Meredith v. Lopez*, 2012 U.S. Dist. LEXIS 92187, * 23 n.1 (E.D. Cal. July 2, 2012) (citing *People v. Bothuel*, 205 Cal.App.3d 581, 595 (1988). In addition, forgery is a crime of moral turpitude. *People v. Parrish*, 170 Cal.App.3d 336, 349 (1985). Consequently, the ALJ's consideration of Plaintiff's criminal history was proper, and supports the adverse credibility determination.

### 6.     Objective medical evidence

As a general rule, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not credible").

Here, the ALJ's credibility determination did not rest solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff.  Thus, objective medical evidence was a relevant factor in evaluating Plaintiff's credibility.  Moreover, the ALJ noted that Plaintiff testified he had "difficulty concentrating and remembering things."  (Doc. 8-3 at 27.)  However, the ALJ noted Plaintiff was able to "recall 3 out of 3 items for recent and remote" memory on a test administered by Molina.  (*Id.* at 29, citing Doc. 8-9 at 6.)  Similarly, the ALJ observed that Dr. Johnson found Plaintiff's "mental status examination was generally unremarkable" (*id.* at 31), and Plaintiff was "able to recall 2/3 objects after an interval of 5 minutes (3/3 with cuing)" (Doc. 8-9 at 46).  Because the ALJ met his burden of identifying "what evidence undermines the testimony," the lack of support in the objective medical record was a relevant factor in the ALJ's credibility analysis. *See Holohan*, 246 F.3d at 1208.

Given the number of factors considered by the ALJ, he carried the burden to make "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958.

**B.      The ALJ's Evaluation of the Medical Record**

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

According to Plaintiff, "[t]he ALJ erred in rejecting the opinions of treating psychiatrist Garewal, consultative psychologist Johnson, and either part or whole of every other consultative and reviewing physician." (Doc. 13 at 2.)  The opinion of a physician may be rejected with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830.  When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict

19

must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

       1.     GAF Scores

As an initial matter, Plaintiff contends the ALJ erred in considering the GAF scores, and criticizes the ALJ for characterizing the GAF scores as "subjective snapshots in time."  (*See* Doc. 13 at 22-24.)  Significantly, however, this court and others have determined that GAF scores are, in fact, "snapshots" of a claimant's abilities at that time.  *See, e.g., Margulis v. Colvin*, 2015 WL 1021117, at *16 (E.D. Mar. 6, 2015) ("GAF scores are unreliable indicators of a claimant's ability to perform sustained work, as they are 'merely a snapshot in time' that may or may not be supported by the overall medical record"); *Parker v. Astrue*, 664 F.Supp.2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning"); *Roy v. Colvin*, 2014 U.S. Dist. LEXIS 101099, *11 n.3. (C.D. Cal. July 15, 2014) (finding "no error" where "[t]he ALJ characterized GAF scores as 'subjectively assessed scores [that] reveal only snapshots of impaired and improved behaviors and state nothing in terms of function-by-function capacity or limitations'").

According to Plaintiff, "Far from the ALJ's characterizing GAF scores as representing mere "snapshots in time," the GAF scores found in the medical evidence provide a longitudinal record of [Plaintiff] overall level of mental functioning.  (Doc. 13 at 23.) In April 2008, Tracy Molina, MSW, gave Plaintiff a GAF score of 40. (Doc. 8-9 at 7.)

 In May 2008, Dr. Johnson gave Plaintiff a GAF score of 45.  (Doc. 8-9 at 45.)  In October 2009, when Plaintiff began treatment with Dr. Gerewal, he was given a GAF score of 50.  (*Id.* at 56.)  Dr. Gerewal opined in June 2010 that Plaintiff's GAF score remained at 50.  (*Id.* at 94.)  In October 2010, Dr. Martin conducted a psychiatric evaluation and determined Plaintiff's current GAF score was 60.  (Doc. 8-10 at 52.)  Thus, the medical record indicates that Plaintiff's overall mental functioning improved over time and as he received treatment. Plaintiff has not cited any authority for the proposition that the ALJ may not consider the prior GAF assessments.

Moreover, "[t]he Commissioner has determined the GAF scale 'does not have a direct correlation to the severity requirements in the Social Security Administration's mental disorders listings.'" *McFarland v. Astrue*, 288 Fed. App'x. 357 (9th Cir. 2008) (quoting *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746, 50,765 (Aug. 21, 2000)).  As a result, the Ninth Circuit has determined that an "ALJ's failure to address the . . . GAF scores specifically does not constitute legal error." *Id.*, 288 Fed. App'x 357.  It follows that the ALJ's rejection of a GAF score does not constitute legal error.  Consequently, the Court finds the ALJ did not err in his assessment of the GAF scores given by Tracy Molina, Dr. Johnson and Dr. Garewal.

### 2.    Evaluation of the opinion of Dr. Garewal

The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ finds inconsistencies between a treating doctor's assessment and his own medical records. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the decision to discount the opinion of a physician).  An opinion may also be rejected where it is "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)).  The conflicting evidence must be identified for the conflict to be considered a specific, legitimate reason for discounting a physician's opinion.  *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

Plaintiff argues the ALJ erred because he "assign[ed] Dr. Garewal's opinion no weight." (Doc. 13 at 24.)  However, the ALJ indicated he rejected the opinion because it was inconsistent with the treatment records. (Doc. 8-3 at 29.)  The ALJ explained the "record indicates that the claimant has been stable and uneventful, medication compliance is good, and no reported side effects." (*Id.*, citing Doc. 8-9 at 93.)  Further, the ALJ found "the record indicates the following: no hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process; intact associations; logical thinking; appropriate thought content; fair social judgment, despite signs of anxiety." (*Id.*) Thus, the ALJ met his burden of identifying inconsistencies within the treatment notes and medical record.  Consequently, the ALJ set forth specific and legitimate reasons for not giving weight to the opinion of Dr. Garewal.

3.       Evaluation of the opinions of Dr. Johnson

Plaintiff argues that the ALJ erred in assessing the opinion of Dr. Johnson, who performed a consultative examination in May 2008.  (Doc. 13 at 19.)  Plaintiff asserts the ALJ committed reversible error because he assigned "no weight" to the opinion of Dr. Johnson, finding that the GAF score of 45 was "fatally inconsistent with the rest of his 2008 opinion."  (*Id.*)

Importantly, however, the ALJ did not reject the entirety of Dr. Johnson's opinion.  To the contrary, the ALJ indicated he gave the opinion "great weight as it is generally supported by the entire record as a whole."  (Doc. 8-3 at 30.)  The only portions given "no weight" were the GAF score of 45 and Dr. Johnson's conclusion that Plaintiff had "some limitations in the area of social functioning." (*Id.* at 30-31.)  The ALJ found the "GAF score of 45, which means serious symptoms or any serious impairment in social, occupational, or school functioning," was "not consistent" with the remainder of the opinion, wherein Dr. Johnson opined Plaintiff had "some limitations in the area of social interaction, but whatever skills he has are probably adequate for a lot of jobs."  (*Id.*)  Further, the ALJ found "little corroboration from the mental status examination, except for subjective reports of not liking people physically behind the claimant and not liking to associate with a lot of people," to support the opinion that Plaintiff "met the criteria for antisocial personality disorder."  (*Id.* at 31.)

The Ninth Circuit has determined an ALJ may reject an opinion when an ALJ finds internal inconsistencies within a physician's report.  *Morgan v*, 169 F.3d at 603.  In addition, an ALJ may reject a physician's opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in."  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  Here, the ALJ noted that despite the fact that Plaintiff reported he did not like being around people, he was able to take public transportation and shop in public.  (Doc. 8-3 at 25-26.)  Therefore, the ALJ identified specific and legitimate reasons for rejecting these portions of Dr. Johnson's opinion.

3.       Evaluation of the opinions of Dr. Martin

Dr. Martin conducted a consultative examination on October 30, 2010, and opined Plaintiff had "no difficulty understanding, remembering, and carrying out simple instructions; mild difficult[y] with detailed and complex instructions . . . and moderate impairment with the ability to interact with the public, supervisors, and coworkers."  (Doc. 8-3 at 31.)  The ALJ gave "significant weight" to the

opinion related to Plaintiff's ability to perform unskilled work and his "concentration, persistence, and pace and adaptation to changes." (*Id.*) However, the ALJ did not give significant weight to the finding of "moderate limitations in social interactions." (*Id.*) Plaintiff asserts this is a legal error. (Doc. 13 at 26-27.)

As explained above, a physician's opinion may be rejected where it is "unsupported by the record as a whole" and where the opinion is inconsistent with a physician's own report. *Mendoza*, 371 Fed. App'x. at 831-32; *Morgan*, 169 F.3d at 603.   In rejecting Dr. Martin's finding that Plaintiff had "moderate limitations in social interactions," the ALJ observed, "Dr. Martin noted that the claimant interacted appropriately with him and the office staff throughout the evaluation." (Doc. 8-3 at 31, citing Doc. 8-10 at 51.) Further, the ALJ found, "Previous mental status examinations revealed that the claimant was fully communicative and had normal speech and intact associations; the claimant appeared neat with good hygiene; and [he] was cooperative with the therapist." (*Id.*, citing Doc. 8-9 at 56, 61.) The ALJ noted that neither Dr. Martin nor Dr. Johnson indicated Plaintiff exhibited uncooperative or unpleasant behavior during the examinations. (*Id.*, citing Doc. 8-9 at 46-47, Doc. 8-10 at 51.) Because the ALJ met his burden identifying conflicting evidence in the record and within Dr. Martin's own report, the inconsistencies are specific and legitimate reasons for discounting the opinion related to Plaintiff's social functioning.

4.     Opinions offered by reviewing physicians: Drs. Bailey, Skopec and Brooks

Plaintiff notes that Drs. Bailey, Skopec and Brooks "[e]ach . . . assessed some type of moderate or partial restriction on [Plaintiff's] capacity for personal interactions, much like the limitations assessed by Dr. Martin." (Doc. 13 at 28.) The ALJ gave "significant weight" to Dr. Bailey's overall opinion but noted he did "not give significant weight to the opinion that the claimant can have superficial public and co-worker contact as there is no supporting evidence in the record." (Doc. 8-3 at 32.) Similarly, with Dr. Skopec's opinion, the ALJ gave "significant weight to the opinion regarding the claimant's ability to sustain simple repetitive tasks with adequate pace and persistence," but "no weight to the opinion that the claimant likely cannot work with the public, as there is little, if any, supporting evidence in the record." (*Id.* at 33.) The ALJ also gave "no weight" to the opinion of Dr. Brooks "regarding the claimant's interpersonal contact" limitations. (*Id.*)

1   As set forth above, the ALJ found social interaction limitations were not supported by the

2   record, and identified conflicting evidence to support his decision.  Moreover, a physician's opinion

3   may also be rejected when it is predicated upon a claimant's subjective complaints that have been

4   properly rejected by the ALJ. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008).

5   The Court explained an opinion "premised to a large extent upon the claimant's own accounts of his

6   symptoms and limitations may be disregarded, once those complaints themselves have been properly

7   discounted." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Flaten v. Sec'y of Health*

8   *& Human Servs.*, 44 F.3d 1453, 1463-64 (9th Cir. 1995)).  Because the ALJ found Plaintiff's subjective

9   complaints lacked credibility and the physicians' opinion regarding Plaintiff's social functioning

10   limitations were based, in part, upon Plaintiff's subjective complaints (Doc. 8-3 at 31), this also is a

11   legitimate reason for rejecting the opinions.

12   **C.    The ALJ's RFC determination encompasses social functioning limitations**

13   Plaintiff challenges the ALJ's RFC determination, arguing that the ALJ "wholly rejects every

14   medical opinion assessing such mental limitations or specifically rejects only the portion of the opinion

15   making those findings." (Doc. 13 at 19.)  As explained above, the ALJ identified specific and

16   legitimate reasons for rejecting each of these opinions.  Regardless, the limitations assessed by each of

17   the physicians are encompassed within the RFC, which limited Plaintiff to "unskilled work."

18   No physician opined Plaintiff had more than moderate limitations in social functioning.

19   Specifically, Dr. Johnson opined Plaintiff had "*some limitations* in the area of social interaction, but

20   whatever skills he has are probably adequate for a lot of jobs." (Doc. 8-9 at 49, emphasis added.)

21   According to Dr. Martin, Plaintiff had a "*moderate* impairment" with the "ability to interact with the

22   public, supervisors, and coworkers." (Doc. 8-10 at 53.)  Dr. Bailey indicated Plaintiff was "*moderately*

23   limited" with his ability to interact appropriately with the general public and get along with coworkers

24   or pears. (Doc. 8-9 at 25.)  Similarly, Dr. Skopec and Brooks determined Plaintiff could sustain simple

25   and repetitive tasks, but was "*moderately* limited" with the ability to work in coordination or proximity

26   to others without being distracted by them and being able to interact appropriately with the general

27   public.  (Doc. 8-9 at 84-86; Doc. 8-10 at 71-72.)  Even Plaintiff's treating physician, Dr. Gerwal,

28   indicated Plaintiff's ability to maintain social appropriate behavior was only "*moderately* limited,"

24

while his ability to interact appropriately with the general public was only "*mildly* limited."  (Doc. 8-9 at 111-12.)

The limitation to unskilled work captures moderate difficulties in social functioning, and accommodates a need for limited contact with others.  *See Rogers v. Comm'f of Soc. Sec. Admin*, 490 Fed. App'x 15, 17 (9th Cir. 2012); *Langford v. Astrue*, 2008 U.S. Dist. LEXIS 39294 at *22 (E.D. Cal. May 14, 2008) ("unskilled work . . . accommodated [the claimant's] need for 'limited contact with others'"); *Akers v. Colvin*, 2014 U.S. Dist. LEXIS 39400 at *22 (Ore. Dist. Jan. 10, 2014) (observing that "the ALJ found Plaintiff has moderate difficulties in social functioning," and "[t]he ALJ incorporated these limitations into plaintiff's RFC by limiting her to 'unskilled work and routine tasks'").  Indeed, by definition, unskilled jobs "ordinarily involve primarily dealing with objects, rather than with data or people." SSR 85-15, 1985 SSR LEXIS 20.  Consequently, "moderate social functioning limitations are not as significant in such jobs."  *Martin v. Astrue*, 2013 U.S. Dist. LEXIS 19651 at *29 (E.D. Cal. Feb. 13, 2013).

Because the limitation to "unskilled" work encompasses the "moderate" social limitations assessed by the physicians, any error by the ALJ in rejecting the physician's opinions must be deemed harmless. *See Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1055 (9th Cir. 2006) (recognizing application of harmless error where a mistake does not affect the ALJ's ultimate disability conclusion).

## CONCLUSION AND ORDER

The ALJ satisfied his burden to make "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958.  Further, the ALJ articulated specific and legitimate reasons to reject the GAF scores and opinions of the physicians related to Plaintiff's social functioning.  However, even if the ALJ had not identified reasons for rejecting the opinions, the limitations assessed are captured in the limitation to unskilled work, and any error by the ALJ in rejecting the opinions must be deemed harmless. *See Stout* 454 F.3d at 1055. Therefore, the conclusion that Plaintiff is not disabled as defined by the Social Security Act must be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.     The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff James Holt.

IT IS SO ORDERED.

Dated:   **March 19, 2015**                    **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE

26